DENVER & N. O. R. Co. *v.* ATCHISON, T. & S. F. R. Co.*

(*Circuit Court, D. Colorado.* February 24, 1883.)

1. RAILROADS—CONTRACT NOT TO DO BUSINESS AT CERTAIN POINTS.

A contract by which one railway company agrees with another upon a division of territory and traffic between them, and that one will not "do any through business to and from Trinidad, or to and from New Mexico via Trinidad or El Moro," amounts to an express renunciation of a duty of transportation enjoined by the state, and is therefore void.

2. SAME— COMBINATION — CONTRACT NOT TO DO BUSINESS IN CONNECTION WITH RIVAL COMPANY.

A contract by which two railway companies agree to exchange their traffic, and not to "connect with or take business from or give business to any railroad" which may be constructed in Colorado or New Mexico after the date of the agreement, is against public policy and void.

3. SAME—DISCRIMINATION—INJUNCTION.

If such companies refuse to accept "through" freight and passengers from a third company, whose road has been built in the territory specified in the

*Reported by Adelbert Hamilton, Esq., of the Chicago bar.

contract, after the date thereof, except at rates or fares higher than the rates or fares charged persons or property coming over the roads of the parties to the contract, such refusal amounts to an unreasonable and illegal discrimination against such traffic coming over the new road, and will be restrained by injunction at the suit of the new company.

4. CONSTITUTIONAL LAW—PROHIBITION OF RAILWAY DISCRIMINATION—CONSTRUC-
TION.

Const. Colo., art. 15, § 4, providing that "every railroad company shall have the right with its road to * * * connect with * * * any other railroad," is not merely authority to the legislature to pass laws on the subject to which it applies, and otherwise incapable of enforcement. While, in the absence of a special law directing such a proceeding, this provision would not authorize a company to make a physical connection of unconnected railroads,. yet, independently of legislative power and action, it requires the railroads in the state of Colorado to be operated in conjunction for the convenience of the public; at least, to the extent usual and customary between connecting lines in the control of companies not hostile to each other; and to this extent it will be enforced by the courts.

5. SAME—NOT IN CONFLICT WITH FEDERAL CONSTITUTION.

The above provision of the constitution of Colorado is not in conflict with section 8, art. 1, of the constitution of the United States, conferring upon congress the power "to regulate commerce with foreign nations and among the several states."

*Wells, Smith & Macon,* for plaintiff.
*Geo. R. Peck* and *Thatcher & Gast,* for defendant.

HALLETT, J. The duty of common carriers to give equal service on equal terms and upon reasonable compensation to all who may apply to them to carry persons or property is as well established as any rule of the common law. As to railroads, it is expressed in section 6, art. 15, of the constitution of this state in the following language:

"All individuals, associations, and corporations shall have equal rights to have persons and property transported over any railroad in this state, and no undue or unreasonable discrimination shall be made in charges or in facilities for transportation of freight or passengers within the state, and no railroad company, nor any lessee, manager, or employe thereof, shall give any preference to individuals, associations, or corporations in furnishing cars or motive power."

As a rule of law it must carry with it all that is essential to its due observance and enforcement. It is good for what is fully expressed in it, and from all that may arise therefrom by necessary implication. Whatever is inconsistent with it, or with the purposes for

which it was adopted, is against public policy, and cannot be upheld. It is a rule of conduct for carriers which is designed to give the public the largest use of public conveyances which may be consistent with the service, and one which leaves to carriers only such powers as are necessary to the business. Thus the carrier may charge for his services, because he cannot work without pay; but he is allowed only a reasonable price, such as will be fair compensation for his labor. He may exclude from his carriage explosive compounds which may be dangerous to other goods and the carriage itself. He may also exclude thieves and gamblers and other mischievious persons who may be traveling for an unlawful purpose. These and the like things for the good of the service the carrier may do, but in general he must have regard for the public interest in all that he does; for, as said by the supreme court, "he is in the exercise of a sort of public office, and has public duties to perform from which he should not be permitted to exonerate himself without the assent of the parties concerned." *New Jersey Steam Nav. Co.* v. *Merchants' Bank*, 6 How. 382; *Munn* v. *Illinois*, 94 U. S. 130.

If, then, a common carrier can set no limits to the service in which he is engaged except such as are inherent in it, the position of the defendant in this controversy is made plain. The defendant refuses to carry to or from Denver, and points between Denver and Pueblo, except in connection with the Rio Grande road; not absolutely, indeed, but for the price charged in connection with that road. To say to the public that the rate shall be less by the Rio Grande road than by any other line, is, in effect, to say that the public shall use that road only. A very little difference in the tolls will prohibit traffic over other lines, and clearly enough such was the effect in this case. It is admitted that defendant refuses to carry, in connection with complainant, at the same rate of charges as with the Rio Grande Company, and that it charges for such carriage a much higher rate. For all practical purposes that course of proceeding amounts to a refusal to carry except in connection with the Rio Grande road. In support of its refusal to deal with complainant as a connecting road, defendant avers that it has entered into a contract with the Rio Grande Company for making "a through line," and doing "through" business between the Missouri river and Denver, which is of great advantage to defendant, and which cannot be maintained except on the theory of exclusive dealing between the parties thereto. So understood, the contract is open to the objection that it gives no choice of route to travelers and shippers of goods, of which something will be said hereafter.

The answer, however, gives no intimation as to the true character of the contract as it appears in evidence. It is an agreement between the Union Pacific Company of the first part, the defendant and its leased lines of the second part, and the Rio Grande Company of the third part, for a division of territory and traffic in Colorado and New Mexico. At the time it was made, March 22, 1880, these companies owned or controlled all the railroads in Colorado and the northern half of New Mexico, and they assume in this agreement to divide the country and allot to each of the parties its separate portion for the purpose of building new railroads. The parties are severally bound not to trespass on the territory of other parties as defined in the agreement, and each stipulates with the other that it will not "voluntarily connect with, or take business from or give business to, any railroad which may be hereafter constructed" in the territory of the other. After settling the question of new roads, the parties proceed to a division of traffic in paragraphs 4, 5, and 6, of the contract, as follows:

"*Fourth.* All traffic to and from the Missouri river, and all competitive local traffic, both passenger and freight, to and from the territory south and west of Denver, reached and covered by the Denver & Rio Grande Railway Company, or the Denver, South Park & Pacific Railroad Company, and lines controlled or constructed or to be constructed by them or either of them, or promoted by and connecting with them or either of them, shall be pooled between the Union Pacific Railway Company and the Atchison, Topeka & Santa Fe Railroad Company, one-half to each; also all traffic to and from the Missouri river, and to and from competitive local points, both freight and passenger, to and from Denver, shall be divided, three-quarters to the Union Pacific Railway Company and one-quarter to the Atchison, Topeka & Santa Fe Railroad Company, each company in each case to deduct 40 per cent. as cost of operating; it being understood and agreed that all local business, both passenger and freight, to and from the Denver, South Park & Pacific Railroad Company east of and including Weston station, shall be treated as Denver business and divided accordingly. It is also understood that the party of the third part is not to do any through business to and from Trinidad, or to and from New Mexico via Trinidad or El Moro.

"*Fifth.* That as long as the parties of the second part, and each of them, shall keep the agreements on their behalf herein contained, one-half of all the traffic, both passenger and freight, originating in Colorado, and also in New Mexico at points as far south as the party of the third part is authorized to build under article 2 of this agreement, and coming or delivered to the party of the third part for transportation over any of the lines of the party of the third part, constructed or to be constructed or promoted by it, or coming or delivered to it for transportation from lines connecting with it, and destined for points east of the line between Denver and El Moro, and said line extended northerly and southerly, shall be delivered at South Pueblo for trans-

portation over the railroads controlled by the parties of the second part, and the other half at Denver for transportation over the railroads controlled by the party of the first part, as far as the party of the third part can legally control such traffic. It is further agreed that as to all traffic, both freight and passenger, interchanged between the party of the third part and the other parties hereto, to and from Denver via South Pueblo, and from and to South Pueblo via Denver, the party of the third part shall be entitled to and shall prorate with the other parties at the rate of one mile and a half to one; that is to say, shall be entitled to and shall share in the distribution of such total fare and freight moneys for each mile of actual haul done by the Denver & Rio Grande Railway Company, as if the same were carried by it one mile and a half; but the allowance of extra mileage shall in no event exceed local rates, and, in case of any more favorable *pro rata* being given to the party of the first part, the same shall be given to the party of the second part. It is further agreed that the rates between South Pueblo and Leadville, and between South Pueblo and all other points west of Pueblo, shall be as low as between the same points and Denver, under any and all circumstances, and the party of the third part shall not discriminate against the parties of the second part in respect of cars or other facilities for the transfer of freight or passengers.

"*Sixth.* In order to enable the party of the third part to carry out its obligations under the above article, and for its protection, it is further agreed that the parties of the second part shall, as long as the party of the third part shall keep the agreements on its behalf herein contained, deliver at South Pueblo, for transportation and traffic, passengers or freight destined from points east of the said line of the party of the third part to points on its line constructed or to be constructed or promoted by it, or connected with it, in Colorado, and also in New Mexico, to points on its line as far south as the party of the third part is authorized to build under article 2 of this agreement, and shall not deliver to, or cause the same to be transported over, or voluntarily receive the same from, any other line or railroad in the territory named than that of the party of the third part, so far as the said parties of the second part can legally control the same; and that any agreement or understanding of the parties of the first and second parts with each other, or of both, or either, or any of them, with any competing railroad for a division of business or territory or earnings that might divert business which would otherwise, under this agreement, pass over the lines of the party of the third part, shall provide for securing to the party of the third part a proportionate benefit on the mileage basis stated in article 5, for not less than one-half of the southern and western business, and one-fourth of the Denver business, as provided in article 4 of this agreement: provided, that this shall not prevent the party of the second part from making any agreement or understanding with the Atlantic & Pacific Railroad Company, without incurring any liability to the party of the first or third parts."

Of this remarkable document it will not be necessary to speak at length in this connection. To do so would perhaps convey an impression that for some purposes these corporations have the powers which in this instrument they have assumed to exercise. It is

enough to say that it is a conspiracy to grasp commerce and suppress the building of railroads in two great states. Similar provisions have fallen under the condemnation of other courts, whose judgment of them has been clearly expressed. In *Hartford & N. H. Co.* v. *New York & N. H. Co.* 3 Robt. (N. Y.) 411, it was held that a provision in a contract forbidding one of the parties to extend its road would avoid the contract. An association of carriers to regulate the price of freight, *with provisions prohibiting the members from engaging in similar business out of the association,* has a tendency to increase the price of carriage and to suppress competition, and is therefore illegal. *Stanton* v. *Allen,* 5 Denio, 434; *Hooker* v. *Vandewater,* 4 Denio, 349.

The Rio Grande Company also agrees, in this instrument, "not to do any through business to and from Trinidad, or to and from New Mexico via Trinidad or El Moro;" an express renunciation of a duty enjoined by the state, and therefore void. If that company can decline a part or all of the carrying business at Trinidad, it may also abandon its entire line and refuse to serve the public in any way. *Shrewsbury & B. Ry. Co.* v. *London & N. W. Ry. Co.* 4 De G., M. & G. 115; S. C. 6 H. L. Cas. 113; *State* v. *Hartford & N. H. R. Co.* 29 Conn. 538 ; *Union Pac. R. Co.* v. *Hall,* 91 U. S. 343.

A more objectionable feature of this instrument is that in which the parties agree not to " connect with or take business from or give business to any railroad," which may be constructed in Colorado or New Mexico after its date. That is to say, these powerful corporations having secured a monopoly of the carrying business in two states, will hold it indefinitely, and refuse to recognize or deal with any rival that may enter the field. Argument is not necessary to show that a compact of this kind is against public policy and therefore void. Certain corporations of Pennsylvania, controlling coal produced in a large district of country, made a combination to regulate the supply and the price, which was held to be illegal. *Morris . Run Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173. In this instance the combination is to control the carrying trade of a great country, which is of much greater importance to the people than coal.

It is believed, however, that the true principle mentioned at first should control without reference to any compact or agreement, valid or otherwise, that may have been made. The carrier service is subject only to conditions and limitations necessary to its existence, and not such as the carrier himself may impose from motives of gain or other purpose. If the defendant may elect to receive goods and pas-

:sengers at Pueblo from the Rio Grande Company, and to deliver to that corporation alone, other conditions may be added, as that the goods shall be brought in wagons and the passengers on horseback. What right has the defendant to say that goods or passengers shall come to it in one way or another? or that goods and passengers carried by it shall be carried to other points beyond its terminus by one company only? The answer of defendant is that such arbitrary distinctions are profitable to it, and therefore lawful. Its first duty is to its stockholders, and anything that will bring money to its exchequer is permissible. In the courts a different view of the subject prevails. *Twells* v. *Pa. R. Co.* is a case decided in the supreme court of Pennsylvania, for which the reporter of that court was probably unable to find space in the regular series of reports. The case may not be of interest to the corporations of that state. The opinion is, however, printed in 3 Amer. Law. Reg. (N. S.) 728, and as it is cited by the court in later cases, it seems to be authentic. Defendant's road extended from Pittsburgh to Philadelphia, and it had arranged with some other road to carry from Philadelphia to New York, so that it was able to carry through to the latter place from points on its own line. By raising the local rate between Pittsburgh and Philadelphia defendant sought to compel shippers to patronize its through line. As the question is stated by the court, defendant said to plaintiff:

"Employ us to carry your oil, not only over our road to Philadelphia, but thence to New York. If you do not, we will exact from you, for its carriage to Philadelphia, six cents per 100 pounds more than we demand from all others who employ us to transport similar freight only to Philadelphia; or, if you will employ us to carry it to New York, after it shall have reached Philadelphia, we will carry it Philadelphia for six cents less per 100 pounds than we are accustomed to charge others for similar transportation."

And the court then adds:

"No one will maintain that they can lawfully make such a stipulation for the benefit of a third party, *e. g.*, one of two other carriers. They cannot say to a shipper at Pittsburgh of any domestic product, 'You have freight destined to New York. You must send it over our road to Philadelphia. If, when it arrives there, you will forward it by A. to New York, we will carry it over our line at certain rates. If you send it by any other than A. our charges will be higher.' This is a discrimination that cannot be allowed. Conceding it, would put in the power of the defendants a monopoly of the carriage of all articles which pass over their road from either terminus to every place of final delivery. The oppressive effects of such a rule are the same, whether its motive be to benefit third parties or the railroad company itself. Of transportation along the line of their road the defendants practically have a monopoly. It is

not consistent with the public interests, or with common right, that they should be permitted so to use it as to secure to themselves superior and exclusive advantages on other lines of transportation beyond the ends of their road."

The court cites *Baxendale* v. *Great Western Ry. Co.* 1 Nev. & McN. 191, which clearly supports the view expressed. That case is said to be reported in 5 C. B. (N. S.) 309, and other English books, as in Neville & McNamara.

So also a carrier cannot refuse to receive a passenger on the ground that his coach connects with another which extends the line to another place, and he has agreed with the proprietors of such other coach that he will not receive passengers from such place unless they come in his coach. *Bennett* v. *Dutton*, 10 N. H. 481. On the same principle a railroad company cannot elect to deliver grain at one warehouse on the line of its road to the exclusion of other warehouses, (*Chi. & N. W. Ry. Co.* v. *People*, 56 Ill. 365,) or to deal with one express company to the exclusion of other express companies. *Sandford* v. *Railroad Co.* 24 Pa. St. 378; *New England Exp. Co.* v. *Maine Cent. R. Co.* 57 Me. 188. These cases are sufficient to show the great weight of authority in support of the rule as stated, that a carrier cannot hamper or limit his duty to the public except in matters essential to the service.

The opposite view has secured recognition from some eminent judges, as in *Jencks* v. *Coleman*, 2 Sumn. 221; but great names do not prevail against great principles, and should not be allowed to do so in this instance.

In all that has been said the right of the defendant to arrange with the Rio Grande Company for a through line to Denver and elsewhere, and to carry its connection with that company, has not been impugned. We recognize the authority of railroad companies to unite in continuous lines for greater facilities in the transportation of passengers and freight, as established in numerous cases. In fact, the constitutional provision to which we shall presently refer seems to demand such union. But we maintain the right of travelers and shippers of goods to choose between rival lines of railroads without let or hindrance from the latter. We deny the power of a railroad company, in the use of its own road, by discriminating charges or other arbitrary measures to compel the public to resort to any other road, or adopt any particular course in the transmission of goods or passengers. This proposition stands with the general rule

before mentioned, that carriers shall not limit or trammel with arbitrary distinctions the service to be rendered; that all roads shall be open to wholesome competition, as declared in the cases in 4 and 5 Denio; and with the doctrine that the carrier shall follow the instructions of his patrons to the extent of forfeiting his earnings in case of disobedience. *Robinson* v. *Baker,* 5 Cush. 137.

We hold, therefore, that defendant is bound to give to complainant reasonable facilities for the exchange of passengers and freight at Pueblo as to all who desire to use complainant's line in connection with its own, and for the price of carriage charged to persons who use the Rio Grande road in connection with defendant's. There is some difficulty in deciding what such facilities shall be. On demurrer to the bill we had occasion to consider the meaning of section 4, art. 15, of the constitution, which declares the right of every railroad to connect with any other railroad, and we arrived at the conclusion that the connection mentioned in the constitution is of a business character involving the interchange of passengers and freight in the manner usual and customary between railroads throughout the country. Objection is now made that the clause referred to is authority to the legislature to pass laws on the subject, but otherwise incapable of enforcement. We have not maintained that the physical connection of tracks provided for could be made without a law to direct the course of proceeding. In this case it is conceded that the roads are united, and the question is whether any use shall be made of the connection. And we shall not attempt to point out the course of legislation or the limits to which it may extend under that section. Independently of legislative power and action, the clause conveys to us the idea that railroads in this state are to be operated in conjunction for the convenience of the public; at least, to the extent usual and customary between connecting lines in the control of companies not hostile to each other. What more may remain for the consideration and judgment of the legislative assembly we are not concerned to know. "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced." Cooley, Const. Lim. 101.

Within this rule the section is obligatory on railroads to the extent indicated, if no further.

It is also objected that this construction of the section brings it into conflict with section 8, art. 1, of the constitution of the United States, which confers on congress the power "to regulate commerce

with foreign nations, and among the several states." The clause referred to directs what shall be done within the state for the advantage of the people of the state. Whatever the effect may be on interstate commerce until congress shall act on the subject, such regulation is within the authority of the state. *Munn* v. *Illinois,* 94 U. S. 113; *Peik* v. *Chi. & N. W. Ry. Co.* Id. 164.

Many witnesses in the service of prominent railway companies were examined as to the course of business between railway companies in the United States in forming continuous lines and sending freight and passengers over connecting roads. The greater number concur in the statement that such arrangements are the subject of special agreement, as to which the corporations interested claim and exercise the absolute authority of natural persons in the daily affairs of business. The evidence discloses what is fully known to all who have given any attention to the subject, that, as to business intercourse, railway companies assume to be absolutely independent of each other. In the strife of competition it is not strange that each should assume to have authority in all things, and yet they do not absolutely refuse to take passengers and freight from each other.

In *Bennett* v. *Dutton,* 10 N. H. 486, in 1837, when the carrying business was young, defendant refused to take plaintiff in his coach because the latter had been guilty of riding in a rival coach. But now the managers of railroads are too wise in the law to make such blunders. By discriminating charges, business may be sent in one way or another to avoid a rival line, as well as by refusing to deliver to such line. An illustration—not given in the evidence, but within the knowledge of many persons in this community—may be recalled: Not many years ago the Union Pacific road and the Denver Pacific road were in the control of companies hostile to each other. They did not refuse absolutely to deliver freight and passengers to each other, but they could not agree in the rates to be charged by each company, and goods from California, consigned to Denver, were carried by Cheyenne to Omaha, 600 miles east of Denver, and then to Kansas City, 200 miles south, and back to Denver, 639 miles. This circuit of more than 1,400 miles was made to avoid the use of the Denver Pacific road from Cheyenne to Denver, a distance of 110 miles, or something like that. If railway companies impose such onerous burdens on the public it must not be supposed that they have authority or law for it. Returning to the evidence, it sufficiently shows that passengers and freight are freely exchanged between connecting railroads in most cases. This is the rule, and the exception

arises when one of the parties conceives that it can make more money by some other course. Obstacles are then made to the continuance of friendly relations in the way of discriminating charges and the like, and the companies become hostile to each other. Now, the right of railroad companies to raise such obstacles in their own interest and against the public interest is the very matter in issue in this cause. We have endeavored to show that they have no such right, and if we have succeeded, the practice itself is not now in the way of granting relief in this cause. If that has not been shown, further discussion will not avail.

We perceive that there is a difficulty in setting up these companies to be agents, each for the other, in the sale of tickets for passage over both lines, and for making through contracts binding on both companies for the transportation of goods. But some things may be done without making either company an agent for the other, and without bringing the companies into any relation of contract or agreement as between them. Passengers and their baggage may be delivered at the junction of the roads by each company, to be transported by the other, and goods may be forwarded in car-load lots and otherwise on terms that will not involve any contract made by one of these companies for and on behalf of the other. The defendant accepting the services of other railroad companies in selling through tickets and making through contracts over its own line, in connection with the Rio Grande road, ought not to object to the same company's performing the same service for complainant if they are willing to do so; nor should defendant be heard to say that it will not carry goods or passengers on the ground that they are to be carried further by complainant from defendant's terminus to some other point. It is, however, unnecessary to discuss in detail the relief to be granted, as that can be well enough expressed in the decree. In this opinion we seek only to define the general rule.

The decree will be for the complainant, but not to the full extent of the prayer of the bill.

McCRARY, J., concurs.

---

### DECREE.

#### (Entered March 1, A. D. 1883.)

This cause came on to be heard at this term of court, and was argued by counsel, and thereupon, upon consideration thereof, it was

ordered, adjudged, and decreed by the court that the said defendant do from henceforth exchange passengers and freight with the plaintiff at the junction of the plaintiff's railroad with the Pueblo & Arkansas Valley Railroad, near to the city of Pueblo, in the county of Pueblo, as in the bill mentioned, and that each party extend to the other all the facilities for such exchange of passengers and freights which are or may be hereafter usual or customary between railroad companies operating connecting railroads, except as hereinafter otherwise provided; and that each company shall cause all regular passenger trains moving upon its railroad to be stopped, upon all trips, at the said junction, and at the platform or depot erected thereat by the plaintiff, a reasonable and sufficient time to enable passengers to conveniently and safely alight from and get upon such trains, and express matter and mails to be delivered therefrom and thereto at the said station; and that the freight trains of each company shall stop at the proper tracks near to the same station whenever the agents of the other company shall signify to those operating such freight trains that there is freight at the said station to be delivered to such train.

*Second.* And that whenever hereafter merchandise or freight shall be received or come to the hands or control of the defendant in carload lots or otherwise, or shall, at any station upon the roads controlled by the defendant, be offered to it to be transported over the Pueblo & Arkansas Valley Railroad, or the said railroad and other railroads controlled by defendant, to Pueblo, or to the junction aforesaid, and thence over the plaintiff's railroad to points thereon or beyond the same, and the shippers thereof (or the consignee, if no directions thereunto be given by the shipper) shall direct that such freight or merchandise be delivered to plaintiff or forwarded over plaintiff's railroad, the defendant shall receive and transport the said freight or merchandise from the place of receiving the same to the junction of the Pueblo & Arkansas Valley Railroad with the railroad of plaintiff near Pueblo aforesaid, and there deliver the same to the plaintiff, to be by the plaintiff transported to the destination thereof, or to the point or terminus of the plaintiff's railroad nearest such destination; and that for the transportation of such freight or merchandise the defendant shall be entitled to demand and receive a reasonable freight money not exceeding the rates and sums by the said defendant at the same time wont to be demanded and received for the transportation of like freight from the same initial point or terminus to the city of Pueblo, when the same is or may be

delivered or contracted or received by defendant to be delivered to the Denver & Rio Grande Railway Company, or any other person or company operating a railroad in competition with the plaintiff; and if the freight moneys for the transportation of such freight or merchandise shall be prepaid wholly or in part, the defendant, after deducting its reasonable charges aforesaid, shall render the residue of said moneys, if any, together with, and at the same time with, the said goods to the plaintiff.

*Third.* And that whenever hereafter merchandise or freight shall be received by the plaintiff in car-load lots, or otherwise, to be transported over its said railroad to the said Pueblo, or the said point of junction, and thence over defendant's railroad to points upon or beyond the same, and the shipper thereof (or the consignee, if no directions thereunto be given by the shipper) shall direct that the same be forwarded over defendant's railroad or delivered to the defendant, the same shall by the plaintiff be transported to the point of junction aforesaid of its said railroad with the Pueblo & Arkansas Valley Railroad, and·there be delivered to the defendant, to be carried and transported by defendant over the said Pueblo & Arkansas Valley Railroad, or the same and other railroads controlled by the defendant, to the destination thereof, or to the point or terminus upon or of defendant's railroad nearest such destination, and that for the transportation of all such freight or merchandise the said defendant shall be entitled to demand and receive a reasonable freight money, not exceeding the rates and sums by the defendant at the same time wont to be demanded and received for the transportation of like freight from Pueblo to the same point or terminus when received from the Denver & Rio Grande Railway Company, or from any other person or company operating a railroad in competition with the plaintiff; and that if the said freight moneys for the transportation of such freight shall be prepaid to the plaintiff wholly or in part, the plaintiff, after deducting its reasonable charges in that behalf, as aforesaid, shall render the residue of the said moneys, if any, together with, and at the same time with, the said goods to the defendant.

*Fourth.* And that all freights and merchandise by the defendant received to be delivered to the plaintiff, or forwarded over plaintiff's railroad, and all freights and merchandise by the defendant received from the plaintiff to be carried and transported over defendant's railroad, shall be forwarded, carried, and transported by defendant at the same speed, and at the same intervals of time, and in like cars, and under like conditions, and with the same conveniences and fa·

cilities, as like freights or merchandise marked, consigned, or directed to be delivered, or by defendant, in fact, delivered, to any other person or company operating a railroad in competition with the plaintiff, or like freights or merchandise by the defendant received from any other such person or corporation operating a railroad in competition with the plaintiff.

*Fifth.* And that whenever either company, in the course of said business, shall receive from the other freight or merchandise, loaded in the cars of such other company, and shall use the cars of such other company for the transportation of such freight, it shall be the duty of the company receiving such cars of the other, if the same shall be unloaded upon its own line, to return the same with all convenient speed, and without reloading the same, to the owner thereof, and to pay therefor reasonable car service or hire, after the same rate and according to the course of dealing heretofore established between the defendant and the Denver & Rio Grande Railway Company; but if the said plaintiff shall at any time demand of defendant for use upon its said railroad, or to be shipped or transported, with the freight therein, over its said road, a number of cars in excess of the number of cars of the plaintiff then in use on defendant's road, payment of the hire of said cars shall be made by the plaintiff in advance from week to week, at the rate and price aforesaid; and nothing herein contained shall be deemed to require either company to furnish to the other empty cars to be loaded and used by such other company, either upon its own railroad or elsewhere.   That whenever and so long as the defendant shall be wont to allow its freight cars to pass to and upon any railroad not owned or controlled by the defendant, it shall be required to allow its freight cars of like character to pass to, upon, and over the railroad of the plaintiff to the same extent as to pass to, upon, and over the railroads of other persons and companies.   That whenever and so long as the plaintiff shall allow its freight cars to pass to, upon, and over other railroads, not owned or controlled by it, plaintiff shall allow its freight cars of like character and to the same extent to pass to, upon, and over the road of defendant, and, save in the case aforesaid, and to the extent aforesaid, neither of said companies party hereto shall be required to allow its freight cars to pass to, upon, and over the road of the other party.

*Sixth.* It is further ordered, adjudged, and decreed by the court that all passengers who shall by the plaintiff be transported over plaintiff's railroad to the junction aforesaid, and who shall desire to be carried from thence over said Pueblo & Arkansas Valley Railroad,

or the same and other railroads controlled by defendant, shall by defendant, at the said junction, be received into the trains of defendant, and therein carried and transported, with their baggage, to the destination of such passengers, or to the point of terminus of or upon the roads controlled by defendant nearest to such destination; and that all passengers upon defendant's railroad, and persons who shall desire to be carried over defendant's railroad to the said junction, and to proceed thence over plaintiff's railroad, shall by defendant be carried and transported over the said Pueblo & Arkansas Valley Railroad and other railroads controlled by defendant, and delivered with their baggage at the said junction of the plaintiff's railroad with the said Pueblo & Arkansas Valley Railroad, and that for the transportation of such passengers, with their baggage, defendant shall be entitled to demand and receive the same fare and sum by the defendant at the same time wont to be demanded and received for the transportation of passengers of the same class, and their baggage, from said city of Pueblo to the same other point or terminus on the railroad of defendant, or from the same other point or terminus on the railroad of defendant to said city of Pueblo, when the said passenger is by defendant received from or carried in connection with the Denver & Rio Grande Railway Company, or any other person or corporation controlling a railroad in competition with the plaintiff, and no more; and that all passengers traveling over the road of plaintiff, from any point or place thereon to the said junction, and desiring to proceed from the junction aforesaid over the roads controlled by the defendant, shall receive from the plaintiff a certificate setting forth that such passenger is entitled to proceed from said junction, over the road of the defendant, at the rates and fares above prescribed, and that all passengers traveling upon the road of the defendant, from any point or place thereon to said junction, and desiring to proceed from said junction over the road of plaintiff, shall receive from the defendant a certificate setting forth that such passenger is entitled to proceed over the road of the plaintiff at the rate and fare aforesaid: provided, nevertheless, that whenever and so long as the said defendant and the Denver & Rio Grande Railway Company shall be wont to insert in the passage tickets by the said companies respectively sold for passage over their railroads in connection, any limitation of the time within which the passage on said ticket shall be made, the parties hereto, and each of them, shall insert in the certificates hereby above required to be issued to passengers the like limit of time, and the passenger receiving such certifi-

cate shall be entitled to passage, by virtue thereof, only where the same is presented and used within the said limit of time; but nothing in this provision shall prevent either company from issuing such certificates without limitation of time, and passengers receiving the same shall be required to pay after the same rate as when traveling upon an unlimited ticket upon the roads of defendant in connection with the road of the Denver & Rio Grande Railway Company.

*Seventh.* It is further ordered, adjudged, and decreed by the court that passengers traveling over plaintiff's railroad and the railroads controlled by defendant, upon tickets issued by any other railroad company, or otherwise, shall be entitled to travel upon the same trains and in the same cars, and shall be entitled to the same facilities, conveniences, attention, and privileges as passengers of the same class traveling upon tickets issued for travel over defendant's railroad and the Denver & Rio Grande Railroad, or the railroad of any person or corporation operated in connection with the railroads controlled by defendant, and in competition with plaintiff's railroad; but this shall not be construed to entitle either company to run its trains over the railroad or railroads controlled by the other company, nor to require or entitle either company to operate the passenger cars of the other company upon its railroad.

*Eighth.* It is further ordered, adjudged, and decreed by the court that if the defendant company doth or shall at any time decline to employ or authorize any other person or corporation controlling or operating a railroad to sell tickets or to issue through bills of lading over the railroads controlled by defendant, and shall refuse to recognize passage tickets or bills of lading issued by any such person or company, said defendant shall not be required to honor any such passage ticket or bill of lading issued by any such person or company over the roads controlled by defendant in connection with the plaintiff's road, nor transport any passenger or his baggage, or any freights or merchandise, over the roads controlled by defendant upon passage tickets or bills of lading issued by such other person or company.

*Ninth.* But whenever and so long as the defendant is or shall be wont to honor the passage tickets, bills of lading, or other contracts of carriage issued by any other company, over the railroads controlled by defendant, or any part thereof, in connection with the Rio Grande Railroad, and to transport passengers and freights thereon, it shall honor the passage tickets, bills of lading, and contracts of carriage issued by the said company over defendant's road and the rail-

road of plaintiff, and carry and transport passengers and their baggage upon such tickets, and freights upon such bills of lading or contracts of carriage.

*Tenth.* It is further ordered, adjudged, and decreed by the court that where, in any case, in the transaction of the said business in connection, either company shall have received and transported freights or merchandise over its railroad, or the same, and roads in connection therewith, upon which the freights earned by such company, or any charges advanced by such company, remain unpaid in whole or in part, such company shall be entitled to demand from the other company all such freights and charges remaining unpaid in respect to such freight or merchandise at the time of the delivery thereof.

*Eleventh.* Whenever and so long as either company, party hereto, is wont to receive, without prepayment of freights or charges thereon, freights or merchandise to be transported over its railroad, and any other railroad operated in competition with the railroad of the other company, party hereto, such company shall be required to receive like freights without demanding prepayment of freights or charges thereon when offered for transportation over its railroad in connection with the railroad of the other company, party hereto; but, save in the cases aforesaid, neither of said companies shall be required by virtue hereof to receive or transport freights or merchandise without prepayment of freights and charges thereon, and neither company shall be required to accept for transportation over its road freight upon which the charges have been prepaid to the other, unless the proper portion of such prepaid charges be rendered to the company to which the said freight is offered, together with, and at the same time with, said freight.

*Twelfth.* It is further ordered, adjudged, and decreed by the court that each company shall, at the said junction, receive freights, and passengers and their baggage, and sell passage tickets to all those desiring to proceed thence, over the roads of said companies respectively, and each company shall there check the baggage of passengers purchasing tickets over its road, and provide reasonable and proper facilities for the discharge of all duties hereby required to be performed by said companies respectively.

*Thirteenth.* It is further ordered, adjudged, and decreed by the court that in and about the transaction of the said business in connection, each party shall extend and accord to the other the same privileges, facilities, and conveniences in all respects by the same party extended to any person or corporation operating a railroad in

competition with the other, without unreasonable or undue discrimination or preference.

*Fourteenth.* It is further ordered, adjudged, and decreed by the court that if, at any time hereafter, the provisions herein made for the purpose of carrying out and effectuating the terms of this decree, in securing to each the rights herein settled and defined, shall appear to be inadequate, either party shall be at liberty to apply to the court for further directions.

*Fifteenth.* It is further ordered, adjudged, and decreed that the provisions herein contained, so far as the same are applicable to the defendant, shall extend to all railroads situate in Colorado, Kansas, New Mexico, Texas, and elsewhere that are either owned, operated, or controlled by the defendant.

*Sixteenth.* It is further ordered, adjudged, and decreed by the court that this decree, and each and every of the directions herein contained, shall be deemed an injunction upon each of the parties hereto, and from and after the expiration of 30 days after the entry hereof the same shall be in full force, and all and singular the officers, agents, and servants of the respective companies shall, from thenceforward, without service thereof, be required to observe and perform the same, under the penalties of a contempt.

*Seventeenth.* It is further ordered, adjudged, and decreed by the court that so much of the plaintiff's bill as prays the court to fix or prescribe the rates or fares to be charged by the defendant, or to apportion rates or fares between the said parties, be and hereby is dismissed without prejudice.

It is further ordered, adjudged, and decreed by the court that the plaintiff recover its costs in this suit expended, to be taxed, and have execution therefor.

---

RAILWAY POOLS. One provision of the contract in the principal case provides for the pooling of certain traffic. The first question which suggests itself with reference to pooling contracts is, are they not *ultra vires* of the companies which form them, as amounting substantially to a partnership of corporations? Every corporation's action is limited "by the four corners of its charter." Ordinarily, railway charters do not authorize them to form partnerships. See *N. Y. & S. C. Co.* v. *Fulton Bank*, 7 Wend. 412; *Pearce* v. *M. & I. R. Co.* 21 How. 441; *Marine Bank* v. *Ogden*, 29 Ill. 248; *Van Kuren* v. *Trenton L. Co.* 13 N. J. Eq. 302; *Catskill Bank* v. *Gray*, 14 Barb. 471; *Whittenton Mills* v. *Upton*, 10 Gray, 582; *Bissell* v. *M. S. & N. I. R Co.* 22 N. Y. 258; *Olcott* v. *Tioga R. Co.* 27 N. Y. 546; *Peckham* v. *North Parish*, 16 Pick. 287; *Stanley* v. *C., C. & C. R. Co.* 18 Ohio St. 552; *Holmes* v. *Old Colony R.*

*Co.* 5 Gray, 58; *Darling* v. *B. & W. R. Co.* 11 Allen, 295; *Gass* v. *N. Y., P. & B. R. Co.* 99 Mass. 220; *M. & H. R. Co.* v. *Niles,* 3 Hill, 162; *C. P. & I. R. Co.* v. *I. & B. R. Co.* 5 McLean, 450; and generally, Green's Brice's Ultra Vires, 423 *et seq.;* Ang. & A. Corp. § 272.

Another question is, are not railway managers who make their company a party to a pool guilty of a breach of trust to their stockholders? The revenues of a railway company are by law required to pay its expenses and its creditors. After these are paid, stockholders have a right to receive any surplus in the shape of dividends. Suppose that a railway that is a party to a pooling contract carries in fact more than its agreed share of the traffic, and gets more than its agreed share of revenue. In order to execute the contract the excess of revenue must be paid by such company to some other company, party to the contract, that has carried less than the agreed share of traffic, and has earned less than its agreed share of revenue. The excess so paid to another company is diverted from the creditors and stockholders of the first company and donated to the second company. Clearly the creditors and shareholders have a right to such diverted funds; and their diversion by the managers appears to be a breach of their duty to shareholders. Perhaps it may be replied with some force that the excess paid to the second company ought to be considered simply as money paid for business which would not be secured, or, if secured at all, only at ruinously cheap rates, and that stockholders ought not to complain of the spending of money to secure such business and to make it profitable, since they receive the ultimate benefits.

Similar views to the foregoing were expressed by Lord Justice KNIGHT BRUCE in *Shrewsbury, etc., Railroad Co.* v. *London, etc., Railroad Co.* 4 De G., M. & G. 121, wherein a company having a road already completed and in operation agreed to divide competitive business and the income thereof with another almost-completed competitive line. Said BRUCE, L. J.: "It was to divert so much of the funds of the company properly applicable for the purposes of their current expenses and of dividends into a different, an irregular, and an illegitimate channel." But different views were expressed in *Hare* v. *London, etc., Railroad Co.* 2 Johns. & H. 112, wherein the vice-chancellor said: "When, in the judgment of the directors and of the company assembled in general meeting, it is found advantageous to give up certain contingent profits in order to secure certain other profits expected from the arrangement, an individual shareholder does not seem to have any right to treat such a contract as an injury to himself."

Again, are not railway pools against public policy? . That policy is to stimulate and maintain competition in all branches of business. "Competition is the life of trade," is the maxim. Several cases throw light upon this question.

In *Stanton* v. *Allen,* 5 Denio, 440, the proprietors of boats on the Erie and Oswego canals formed a pooling association. They agreed to regulate and fix the price of freight and passage, to divide the profits of their business according to the number of boats employed by each, and that members should not engage in a similar business outside of the association. The New York court of appeals held the agreement unlawful, saying: "It is nothing less than the attainment of an exemption of the standard of freights, and the

facilities and accommodations to be rendered to the public from the wholesome influence of rivalry and competition. To produce that end more completely, each member binds himself not only to run all his present boats according to the agreement and turn their earnings into the common stock, at the rates agreed upon, and at which rate he is to be charged in the final distribution, though he may have received or charged less, but he is also prohibited, under severe penalties, from employing on any other terms boats subsequently acquired. Besides, as much as possible to secure the exclusion of others from their fair share of business, each party is bound, if he shall have more freight than he can carry, to offer it to some of the associates; and if they do not take it he is then authorized to procure its transportation without limitation as to rate, and after taking out the freight, and certain charges for risk and trouble, to turn in the balance to the common stock. The association being thus secure against internal defection and external encroachments, and the members having thrown their concerns into stock, to derive an income in proportion to the number of shares they hold, and not according to their merit and activity in business, and safe against the reduction of compensation that would otherwise follow mean accommodations and want of skill and attention, the public interest must necessarily suffer grievous loss. Indeed, the consequence of such a state of things would shortly be that freighters and passengers would be ill served, just in proportion that carriers were well paid." *Stanton* v. *Allen*, 5 Denio, 441. See, also, *Hooker* v. *Vandewater*, 4 Denio, 349.

In *People* v. *Fisher*, 14 Wend. 9, it was decided that a combination of shoemakers to raise their wages is a conspiracy against trade and commerce, and punishable as such.

In another case five coal corporations of Pennsylvania entered into an agreement in New York to divide two coal regions of which they had the control; to appoint a committee to take charge of their interests, which was to decide all questions and appoint a general agent at Watkins, New York; the coal mined to be delivered through him; each corporation to deliver its proportion at its own costs in the different markets at such time and to such persons as the committee might direct; the committee to adjust the prices, rates of freight, etc.; enter into agreements with anthracite companies; the five companies might sell their coal themselves only to the extent of their proportion, and at prices adjusted by the committee; the agent to suspend shipments to either beyond their proportion; frequent detailed reports to be made by companies, and settlements monthly by the committee; prices to be averaged and payments made to those in arrear by those in excess; neither to sell coal otherwise than agreed upon; and the regulations of the committee to be carried out faithfully. A statute of New York makes it a misdemeanor for "persons to conspire to commit any act injurious to trade or commerce." The supreme court of Pennsylvania decided that this agreement was in contravention of that statute, and also against public policy, and therefore illegal and void.

Said Judge AGNEW: "The effects produced on the public interests lead to the consideration of another feature of great weight in determining the illegality of the contract, to-wit, the combination resorted to by these five

companies. Singly, each might have suspended deliveries and sales of coal to suit its own interests, and might have raised the price, even though this might have been detrimental to the public interest. There is a certain freedom which must be allowed to every one in the management of his own affairs. When competition is left free, individual error or folly will generally find a correction in the conduct of others. But here is a combination of all the companies operating in the Blossburg and Barclay mining regions, and controlling their entire productions. They have combined together to govern the supply and the price, and the price of coal in all the markets from the Hudson to the Mississippi rivers, and from Pennsylvania to the lakes. This combination has a power in its confederated form which no individual action can confer. The public interest must succumb to it, for it has left no competition free to correct its baleful influence. When the supply of coal is suspended, the demand for it becomes importunate and prices must rise. Or, if the supply goes forward, the price fixed by the confederates must accompany it. The domestic hearth, the furnaces of the iron master, and the fires of the manufacturer, all feel the restraint, while many dependent hands are paralyzed and hungry mouths are stinted. The influence of a lack of supply or a rise in the price of an article of such prime necessity cannot be measured. It permeates the entire mass of the community, and leaves few of its members untouched by its withering blight. Such a combination is more than a contract: it is an offense. 'I take it,' said GIBSON, J., 'a combination is criminal whenever the act to be done has a necessary tendency to prejudice the public or to oppress individuals by unjustly subjecting them to the power of confederates, and giving effect to the purpose of the latter, whether of extortion or mischief.' *Com.* v. *Carlisle*, Brightley, 40. In all such combinations, where the purpose is injurious or unlawful, the gist of the offense is conspiracy. Men can often do, by the combination of many, what severally no one could accomplish, and even what, when done by one, would be innocent."

The same learned jurist says again: "Every 'corner,' in the language of the day, whether it be to affect the price of articles of commerce, such as breadstuffs, or the price of vendible stocks, when accomplished by confederation to raise or depress the price and operate on the markets, is a conspiracy. The ruin often spread abroad by these heartless conspiracies is indescribable, frequently filling the land with starvation, poverty, and woe. Every association is criminal whose object is to raise or depress the price of labor beyond what it would bring if it were left without artificial aid or stimulus." *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173.

Two railway companies in England made an agreement to divide their receipts in the proportion of nine-tenths to one company and one-tenth to the other. Sir W. PAGE WOOD, V. C., granted an injunction restraining the companies from proceeding under it, and said: "An agreement that the profits and loss shall be brought into one common fund, and the net receipts divided into two shares of nine-tenths and one-tenth, without the authority of an act of parliament, appears to me so clearly and palpably illegal, that I do not think the court ought to hesitate in its views in that respect; otherwise it might be that all the railways in the kingdom might be collected into one

large joint-stock concern." *Charlton* v. *New Castle, etc., R. Co.* 5 Jur. (N. S.) 1100.

As late as 1880 the supreme court of Ohio passed upon and condemned a contract by which all the salt manufacturers, with one or two exceptions, in a large salt-producing territory, formed an association by the articles of which all salt manufactured or owned by the members when packed in barrels became the property of the company, whose committee was authorized and required to regulate the price and grade thereof, and also to control the manner and time of receiving salt from the members; and each member was prohibited from selling any salt during the continuance of the association except by retail at the factory, and at prices fixed by the company. Said the court: "The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade; and for that reason, on grounds of public policy, courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public." *Salt Co.* v. *Guthrie,* 35 Ohio St. 672.

In *Central R. Co.* v. *Collins,* 40 Ga. 582, the court thought that the grants by the state of Georgia of charters to several railroads, from the seaboard to the interior, indicate a public policy to secure a reasonable competition between those roads for public patronage. But an entirely different view was taken by the vice-chancellor in the English case of *Hare* v. *London, etc., R. Co.* 2 Johns. & H. 80, in which two groups of railway companies, being respectively the owners of independent coterminous routes, agreed to divide the profits of the whole traffic in certain fixed proportions, calculated on the experience of the past course of traffic. It was held that such an agreement, being *bona fide,* was not *ultra vires.* The vice-chancellor said: "With regard to the argument against the validity of the agreement, I may clear the ground of one objection by saying that I see nothing in the alleged injury to the public arising from the prevention of competition. I find no indication in the course taken by the legislature of an intention to create competition by authorizing various lines. From my own experience in parliamentary committees, I should rather be disposed to say that the legislature wisely inclined to avoid authorizing the construction of two lines, which would necessarily compete with each other. It is a mistaken notion that the public is benefited by pitting two railway companies against each other till one is ruined, the result being at last to raise fares to the highest possible standard. The legislature protected the public in a different way, by a provision limiting the maximum of tolls to be taken, and with respect to fares it guarded against excessive profits by an exactment (7 and 8 Vict. *c.* 85, §§ 1, 2,) that in the event of profits reaching 10 per cent., the treasurer may revise the scale of fares, and that the board of trade may, under certain conditions, purchase the line. Except by fixing a maximum rate of tolls, and, as far as practicable, a maximum amount of profit, the legislature has imposed no conditions in favor of the traveling public. I cannot have any doubt that it is competent for a railway company to abstain altogether from carrying. If a company enters

upon the carrying business, it is bound to carry on equal terms for all; but I find in the acts no obligation upon a company to become carriers, except as to the mails and the queen's troops." 2 Johns. & H. 112. On the validity of pooling contracts in England, see, also, the case of *Shrewsbury, etc., R. Co.* v. *London, etc., R. Co.* 20 Law J. Ch. 90, 102; 3 McN. & G. 70; 17 Q. B. 652; 21 Law J. Q. B. 89; 16 Beav. 441; 4 De G., M. & G. 115; 22 Law J. Ch. 682; 6 H. L. Cas. 113; 26 Law. J. Ch. 482.

There is no question, however, but that, according to the weight of American authority, a railway pooling contract is monopolous in its tendency, and objectionable as such for the three reasons so tersely set forth by Lord COKE in *Darcy* v. *Allen*, 11 Coke, 84: "A monopoly hath three incidents mischievous to the public: (1) The raising of the price; (2) the commodity will not be so good; (3) the impoverishing of poor artificers." The formation of every railway pool is always followed by the advancement and maintenance of rates, cut down by competition. The pool's effect upon new lines is perceived in the principal case where the combined companies have clearly undertaken to keep the newer and weaker company out of business. In the light of the foregoing decisions, railway pooling contracts appear to be clearly illegal.

CONTRACTS NOT TO EXCHANGE TRAFFIC. May two railway companies agree not to " connect with, or take business from, or give business to any [other] railroad," except at rates higher than those which are charged upon traffic the parties to this agreement exchange with each other? Certainly not, unless the traffic coming from or consigned to the other railroad costs more for carriage than that which is exchanged between the contracting companies. Railway charges must be based upon the expense of transportation. If, by reason of the bulk, the manner, and times in which the traffic is delivered by the shipper to the carrier, the latter is enabled to handle and transport the traffic at less cost than he can the traffic of others, and is willing to extend the same terms to all shippers who bring themselves within the same conditions, the discrimination is legal. *Ransom's Case*, 87 E. C. L. 437; *Oxlade's Case*, 87 E. C. L. 453; *Nicholson's Case*, 94 E. C. L. 366; *Harris* v. *Cockermouth, etc., Co.* 91 E. C. L. 712. If, therefore, a railway company proposes to discriminate in its charges against traffic coming from or going to another railway, the former company must show an increased cost of carriage to justify its discrimination, else it will be unreasonable and illegal.

There are two cases, however, which appear to conflict somewhat with the ruling in the principal case. One is the *Southsea & Isle of Wight Steamferry Co.* v. *London & S. W. R. Co. and the L. B. & S. C. R. Co.* 2 Nev. & McN. 341, wherein the S. Steam-boat Company and the R. Steam-boat Company respectively owned passenger steam-boats, plying between S. and R., and the B. and the S. W. Railway Companies carried passengers by their own lines to S.; and having entered into a traffic arrangement with the R. Steam-boat Company that their vessels should run between S. and R. in connection with the lines of the railway companies, issued through tickets to passengers from places on their lines to R., available by the boats of the R. Steam-boat Company, to the exclusion of the boats of the S. Steam-boat Company. It was decided that this arrangement did not amount to an undue preference of the R. Steamboat Company. But there were peculiar circumstances in this case that led

the court to hold the discrimination against the S. Company warranted. It did not furnish as large boats or as ample accommodations for the traffic as the R. Company.

In the *Eclipse Tow-boat Co.* v. *Pontchartrain R. Co.* 24 La. Ann. 1, the defendants, owning a short railway from New Orleans to Lake Pontchartrain, and one Morgan, owning a line of steamers plying from the lake terminus to Mobile, and the plaintiffs and other parties owning two other steamers in the same trade, an arrangement was made by defendants with Morgan, and, temporarily, with the proprietors of the other steamers, respectively, to share *pro rata* the through freight from New Orleans to Mobile. It appeared that this arrangement was unprofitable to the defendants, for the lines of steamers, by competing and lowering the rates of freight, greatly reduced the share coming to the railway. The defendants, therefore, entered into an agreement with Morgan by which the latter loaned them $250,000, and the former agreed to *prorate* with him the through freight from New Orleans to Mobile, and to charge all other steamers the tariff rates paid by the public generally. The plaintiffs immediately laid up their steamer, and sued for damages, on the ground that this prorating with Morgan, and refusing further to prorate with plaintiffs, was an illegal combination with Morgan to confer on him an unlawful monopoly and preference. A verdict and judgment of $100 was awarded plaintiffs. This judgment the supreme court affirmed, but refused to increase it in amount, and decided that the acts of defendants were not in contravention of any statute of Louisiana, or any principle of her jurisprudence; that they might agree or refuse to prorate through freight with anybody, and the plaintiffs could not complain of a refusal to *prorate* with them; and that, as common carriers, in the absence of statutory prohibition, their acts in the premises were not unlawful. The opinion of a majority of the court presents a curious mixture of theology, modern science, bad law, and judicial subserviency to the interest of wealth and power:

"The Creole [plaintiffs' boat] was 16 years old at this time. Her cost to plaintiffs was $35,000; her tonnage 396 tons. Morgan placed on the route three steamers, aggregate tonnage 2,800 tons, and cost $585,000." After affirming that no one can be held liable for the regular and prudent exercise of a legal right that belongs to him, and that he does not commit a fault by making use of a right, the majority opinion continues: "And these principles are especially applicable to the competitions of modern commerce. 'To him that hath shall be given, and from him that hath not shall be taken away, even that he hath.' One man by rare powers of combination acquires capital, and by its use builds up a business which dwarfs and finally kills the trade of his less fortunate neighbor. We may pity the weaker merchant, but we cannot mulct the stronger one in damages. The great law of 'natural selection' is something we cannot repeal, and 'the fittest survive,' and always will.

"The case is narrowed, then, to the inquiry whether there was anything unlawful and legally injurious to plaintiff in the agreement made by the Pontchartrain Railroad Company with Charles Morgan, by which, in the language of their trade, they 'prorated' the through freight with him to and from

New Orleans and Mobile, and declined to further *prorate* with plaintiffs. We cannot perceive anything illicit in this agreement. The plaintiffs do not pretend that the railroads charged them, or the public generally, too much, but that it charged Morgan too little. . What law did they violate in so doing? No statute of Louisiana has been infringed; none is quoted by appellants except the charter of the company, and that is silent on the subject. No rule of jurisprudence has been violated, so far as we can perceive. The company is a judicial person; its special business is to make contracts in regard to freight, and what is there to prevent it from making an agreement by which a large loan is secured to enable it to extend its road and build its depots, and by which a daily line of fine steamers is secured to connect its short route with the great highways to the east and north? And what is there to prevent its declining to 'prorate' with the Creole and Camelia, when it found that the effect of prorating with several lines was to enable them to engage in the game of competition at the expense of the railroads?

"The plaintiffs never offered to loan the railroad a quarter of a million of dollars or any other sum; the plaintiffs never offered to establish a daily line of large, swift steamers; they call their own vessel the 'Poor Little Creole.' Why should they complain, then, if the company chooses to avail itself of the great advantages offered by Morgan? But, above all, why should they complain if the railroad refuses to *prorate* with them when it is not bound to prorate with any one?"

The dissenting opinion of Mr. Justice TALLIAFERRO is more in accordance with the law. "It is shown," said he, "that the [railroad] company published a tariff of prices for the carriage of goods, to go into operation on the fifteenth of November, 1867. All were required to pay the prices so fixed *who did not ship* to and from the lake terminus of the railroad by the Morgan line of steamers; but those who did ship by the Morgan line were not required to pay them, and were charged vastly less for their transportation. The discrimination was very large, and evidently intended by the company to enable the Morgan line of steamers to grasp the entire carrying trade through the lakes by excluding the boats of plaintiff,—an object which the evidence satisfies me the Morgan steamers had previously been unable to do by fair competition. I believe it to be against equity and conscience to give, as this company has avowedly done, undue preferences to one party to injure another. Not even the plea that circumstances may justify the violation of individual right to promote the general good can be interposed in this case. The evidence is that the prices of transportation by the Morgan steamers were raised shortly after they got rid of the competition that had been kept up previously by the boats of the plaintiffs,—a result naturally and certainly to be expected. I think this a case in which exemplary damages should be awarded to redress a private wrong, and to vindicate public justice."

*Chicago.*                                        ADELBERT HAMILTON.